STATE OF NORTH DAKOTA EX REL. HENRY J. LINDE, Attorney General, and B. V. Moore, Relator, v. W. C. TAYLOR, Commissioner of Insurance of the State of North Dakota, and as Such Commissioner, John Steen, State Treasurer of the State of North Dakota, and as Such Treasurer, and J. G. Johnson, State Examiner of the State of North Dakota, and as Such Examiner.

(L.R.A. —, —, 156 N. W. 561.)

**Supreme court — prerogative jurisdiction — questions involved— publici juris — state sovereignty — franchises — prerogatives — liberties of the people — private rights.**

1. The prerogative jurisdiction of the supreme court may be exercised only in cases wherein the questions involved are *publici juris*, and the sovereignty of the state, or its franchises or prerogatives, or the liberties of its people, are affected; and this jurisdiction cannot be exercised to vindicate or protect mere private rights regardless of their importance.

**Supreme court — original proceedings in — state is plaintiff — relator a mere incident.**

2. In an original proceeding in the supreme court, the state is the actual plaintiff, and the relator, a mere incident.

**Legislature — acts — validity — test — state and Federal Constitutions — violations — express or implied.**

3. The only test of the validity of an act regularly passed by a state legislature is whether it violates any of the express or implied restrictions of the state or Federal Constitutions.

**Wisdom — necessity — propriety — expediency — legislation — questions for the legislature — not judicial.**

4, 10. The wisdom, necessity, or expediency of legislation are matters for legislative, and not judicial, consideration.

**State bonding fund — official bonds — for county — city — public officials — judicial powers — state examiner — commissioner of insurance.**

5. Chapter 62 of the Laws of 1915, establishing a state bonding fund for the purpose of furnishing official bonds for county, city, village, school district,

and township officers is not unconstitutional, as conferring judicial powers on the state examiner and commissioner of insurance.

**Laws — public policy — violation of — legislature — limitation — state constitution — Federal Constitution.**

6. Courts are not at liberty to declare a law void as in violation of public policy. Such policy is determined by the legislature, and the only limits upon the legislative power in such determination are those fixed in the state and Federal Constitutions.

**Legislative powers — delegation of — insurance commissioner — state auditing board.**

7. Chapter 62, Laws 1915, is not invalid on account of delegating legislative power to the commissioner of insurance and state auditing board.

**Statutory interpretation — construction — object of — legislative intention — effect given to.**

8. The object of all statutory interpretation and construction is to ascertain and give effect to the intention of the legislature.

**Valid law — presumption — legislative intent — construction — open to different — method of.**

9. It is presumed that the legislature intended to enact a valid law, and, therefore, when a statute is susceptible of two constructions, one of which will render it valid and another which will render it unconstitutional and void, the former construction will be adopted.

**Constitutional inhibitions — taking of private property — due process of law — guarantees — equal rights — privileges — benefits — who may claim.**

11. All constitutional inhibitions against the taking of private property without due process of law, and all constitutional guarantees of equal rights and privileges, are for the benefit of those persons only whose rights are affected, and cannot be taken advantage of by any other persons.

**Supreme Court — original proceeding — law — constitutionality — conditions anticipated — courts — whole act — validity of.**

12. In an original proceeding in the supreme court, wherein a law is assailed as being unconstitutional, the court will not anticipate conditions which may never arise, or determine questions relating to the validity of minor provisions as to detail, but will consider only those questions which relate to the validity of the whole act.

**Constitution — laws — general nature — uniform operation.**

13. Chapter 62, Laws 1915, is not violative of § 11 of the State Constitution, which requires that all laws of a general nature shall have a uniform operation.

**Constitution — money — State Treasury — appropriation — warrant.**

14. Said chapter 62 does not contravene § 186 of the Constitution, which provides that no money shall be paid out of the state treasury except upon an appropriation by law, and on warrant drawn by the proper officers.

**Constitutional guarantee — express — implied — self-government — local.**

15. Said chapter 62 does not violate any express or implied constitutional guaranty of the right of local self-government.

**Constitution — taxation — moneys — expenditure.**

16. Said chapter 62 does not contravene §§ 175, 176, or 179 of the State Constitution, relating to taxation and the expenditure of moneys raised by taxation.

**Levy of taxes — collection of — purposes — public — private property — private use — compensation.**

17. Said chapter 62 does not require taxes to be levied and collected for other than public purposes, or authorize the taking of private property for private use without compensation.

**Municipal officers — bonding fund — premiums — losses — public officers — police power of State — exercise of.**

18. The establishment and operation of a fund for the bonding of municipal officers and the collection of premiums from the various municipalities whose officers are bonded for the purpose of creating a fund to secure the payment of losses which may result by reason of the nonfeasance, misfeasance, or defalcation of such public officers, is a valid exercise of the police power of the state.

Opinion filed February 5, 1916.

Original proceedings in this court by the State on the relation of B. V. Moore, for the issuance of a writ prohibiting and enjoining the Commissioner of Insurance, State Treasurer, and State Examiner from establishing and operating a state bonding fund, as required by chapter 62, Laws of 1915.

Writ denied.

*Lawrence & Murphy,* for plaintiffs.

The act contains an unwarranted delegation of judicial power to the state examiner and to the commissioner of insurance. State ex rel. Miller v. Taylor, 27 N. D. 77, 145 N. W. 428.

This is a proceeding not *in rem,* but *in personam.* The only way to secure personal service is to make such service *personal.* In such cases where personal rights and obligations of parties are to be determined

personal service within the state, or a voluntary appearance in the cause, is essential to jurisdiction. D'Arcy v. Ketchum, 11 How. 174, 13 L. ed. 652; Webster v. Reid, 11 How. 437, 13 L. ed. 761; Cooper v. Reynolds, 10 Wall. 316, 19 L. ed. 932; Pennoyer v. Neff, 95 U. S. 714, 24 L. ed. 565; St. Clair v. Cox, 106 U. S. 353, 27 L. ed. 223, 1 Sup. Ct. Rep. 354; Pana v. Bowler, 107 U. S. 529, 27 L. ed. 424, 2 Sup. Ct. Rep. 704; Hart v. Sansom, 110 U. S. 151, 28 L. ed. 101, 3 Sup. Ct. Rep. 586; Grover & B. Sewing Mach. Co. v. Radcliffe, 137 U. S. 294, 34 L. ed. 671, 11 Sup. Ct. Rep. 92; Wilson v. Seligman, 144 U. S. 41, 36 L. ed. 338, 12 Sup. Ct. Rep. 541; McGehee, Due Process of Law, 89, 90; State ex rel. Miller v. Taylor, 27 N. D. 77, 145 N. W. 430; Galpin v. Page, 18 Wall. 350, 21 L. ed. 959; Hovey v. Elliott, 167 U. S. 409, 42 L. ed. 215, 17 Sup. Ct. Rep. 841.

In actions *in personam* of a strictly judicial character, and proceeding according to the common law, service of summons by publication, on resident defendants, who are within the state and can be found in state, is not "due process of law." Bardwell v. Collins (Bardwell v. Anderson), 44 Minn. 97, 9 L.R.A. 154, 20 Am. St. Rep. 547, 46 N. W. 315; Moredock v. Kirby, 118 Fed. 186; Bear Lake County v. Budge, 9 Idaho, 703, 108 Am. St. Rep. 179, 75 Pac. 614.

Under the police power of the state, the legislature cannot authorize a public officer to bring a suit to settle private rights to the use of water or the priority of such rights. Bear Lake County v. Budge, supra; Brown v. Levee Comrs. 50 Miss. 468.

The act is unlawful, discriminating, and contains arbitrary classifications. It amounts to special legislation. State ex rel. McKell v. Robins, 71 Ohio St. 273, 69 L.R.A. 427, 73 N. E. 470, 2 Ann. Cas. 485; Vermont Loan & T. Co. v. Whithed, 2 N. D. 82, 49 N. W. 318.

No moneys can be drawn from the state treasury with, first, an appropriation for the purpose, and, second, only upon allowance of the claim with and by the state auditing board. The act in question is void in that provision is not made for either of these things to be done. Const. § 186.

The act constitutes a legislative interference with local and municipal affairs. The legislature is supreme only in matters of purely legislative concern. The economic affairs of local municipalities is another matter entirely, likened unto the personal concerns of the individual. Conlin

v. San Francisco, 99 Cal. 17, 21 L.R.A. 474, 37 Am. St. Rep. 17, 33 Pac. 753; Lund v. Chippewa County, 93 Wis. 640, 34 L.R.A. 131, 67 N. W. 927; People ex rel. LeRoy v. Hurlbut, 24 Mich. 44, 9 Am. Rep. 103; Oakley v. Aspinwall, 3 N. Y. 568.

The act violates various provisions of the state Constitution with reference to taxation and the expenditure of moneys raised by taxation. Const. §§ 175, 176, 179; People ex rel. Twitchell v. Blodgett, 13 Mich. 139.

Every tax raised must not only be for a public purpose, but it must be for a *local* public purpose and expended in the district in which it was raised. Taxes are thus reciprocal in their nature. Weeks v. Milwaukee, 10 Wis. 243; Ryerson v. Utley, 16 Mich. 269; Merrick v. Amherst, 12 Allen, 504; Wells v. Weston, 22 Mo. 384, 66 Am. Dec. 627; Covington v. Southgate, 15 B. Mon. 491; Morford v. Unger, 8 Iowa, 82; Stetson v. Kempton, 13 Mass. 272, 7 Am. Dec. 145; People v. Albany, 11 Wend. 539, 27 Am. Dec. 95; Parsons v. Goshen, 11 Pick. 396; Anthony v. Adams, 1 Met. 284; Weismer v. Douglas, 64 N. Y. 99, 21 Am. Rep. 586.

It is the essence of taxation that it should compel the discharge of a burden by those upon whom it rests. 1 Desty, Taxn. 285, 287; Farris v. Vannier, 6 Dak. 186, 3 L.R.A. 713, 42 N. W. 31.

The act is wrong, because it provides for a tax to create a fund for *future* distribution. State ex rel. Owen v. Donald, 160 Wis. 21, 151 N. W. 331.

The state cannot engage in private business. The purpose of the formation of government is to *govern;* but the state cannot arrogate to itself, the *rights* of the *people.* Citizens' Sav. & L. Asso. v. Topeka, 20 Wall. 661, 22 L. ed. 461; Ex parte Merryman, Taney, 246, Fed. Cas. No. 9487; Re Pacific R. Commission, 32 Fed. 254; 3 Adam Smith, Wealth of Nations, 545; 1 Kent, Com. p. 450; Herman v. State, 8 Ind. 548; State ex rel. Coleman v. Kelly, 71 Kan. 811, 70 L.R.A. 450, 81 Pac. 457, 6 Ann. Cas. 298; Butchers' Benev. Asso. v. Crescent City L. S. L. & S. H. Co. 16 Wall. 111, 21 L. ed. 420; McCullough v. Brown, 41 S. C. 220, 23 L.R.A. 410, 19 S. E. 458; State ex rel. George v. Aiken, 42 S. C. 222, 26 L.R.A. 357, 20 S. E. 221; Rippe v. Becker, 56 Minn. 100, 22 L.R.A. 857, 57 N. W. 331; State ex rel. Monnett v. Guilbert, 56 Ohio St. 575, 38 L.R.A. 524, 60 Am. St. Rep. 756, 47 N.

E. 551; State ex rel. Toledo v. Lynch, 88 Ohio St. 71, 48 L.R.A.(N.S.) 720, 102 N. E. 673, Ann. Cas. 1914D, 949.

No municipality is a "trading corporation." Such corporations are invested with public trusts of governmental and administrative character. Nashville v. Ray, 19 Wall. 476, 22 L. ed. 169; Elliott, Constitutional Debates, N. D. 438; Winspear v. District Twp. 37 Iowa, 544; Thomas v. Taylor, 42 Miss. 706, 2 Am. Rep. 625.

*Henry J. Linde,* Attorney General, *Francis J. Murphy,* and *H. R. Bitzing,* Assistant Attorneys General, for defendants.

The amount to be paid each year for additional help made necessary by the extra work of the offices named, is unconditionally limited to a fixed sum, and is in no sense uncertain or speculative, and cures the defect in the former law, of which complaint was made and sustained. Act of 1915, § 14; State ex rel. Miller v. Taylor, 27 N. D. 77, 145 N. W. 425.

Where there is no constitutional limitation in a state Constitution against the doing of certain acts, the people, through the legislature, have a right to do such acts. State ex rel. Board of Regents v. Ekern, 159 Wis. 319, 150 N. W. 506.

CHRISTIANSON, J. This is an original proceeding in this court against the commissioner of insurance, state treasurer, and state examiner to prevent them from putting into operation chapter 62 of the Session Laws of 1915, on the ground that this act is unconstitutional.

This act establishes a state bonding fund for the purpose of bonding such county, city, village, school district, and township officers as are, or may hereafter be required by law, to furnish official bonds; provides the form of bond, the amount of premiums to be paid, and fixes the maximum amount of any bond to be written at $50,000; and prescribes certain duties to be performed by the commissioner of insurance, state treasurer, and state examiner in the organization and operation of such state bonding fund.

The relator is a qualified elector, freeholder, and taxpayer in the city of Fargo, Cass county, in this state, and a stockholder in the Dakota Trust Company, a corporation organized under the laws of this state, and since December, 1908, engaged in the business of issuing surety and indemnity bonds (among others), to state, county, city, and school dis-

33 N. D.—6.

trict officers in this state. The relator asserts that the act in question is unconstitutional for the following ten reasons:—"

I. The act contains an unwarranted delegation of judicial power to the state examiner and to the commissioner of insurance.

II. If the act does not contain a specific and unwarranted delegation of judicial power as stated, it is then void as a matter of public policy in that no provision is made for the payment of losses, except by litigation and the use of the courts of the state in every instance before money can be withdrawn from the state treasury.

III. The act contains an unwarranted delegation of legislative power to the commissioner of insurance and to the state auditing board in the determination of the amount of public moneys to be used for particular purposes.

IV. If the act does not contain a specific delegation of unwarranted legislative power as referred to in the preceding proposition, then the act is wholly ineffective, inoperative, and impossible of performance because of lack of means and funds to conduct the same without devoting thereto other public moneys.

V. The act deprives citizens of the state of the constitutional right of due process of law in requiring the appointment of an attorney in fact upon whom service of judicial process may be made.

VI. The act contains wrongful and unlawful discrimination and arbitrary classifications.

VII. The act is void in that it provides for a withdrawal of moneys from the state treasury without appropriation, presentation of, or allowance of, a claim filed with the state auditing board.

VIII. The act constitutes a legislative interference with local and municipal affairs.

IX. The act violates various provisions of the state Constitution with reference to taxation and the expenditure of moneys raised by taxation.

X. This legislation as a whole violates the fundamental law in that it engages the sovereign state in a private business in competition with the citizens of the state."

Before entering into a discussion of the questions raised by the relator, it is proper to consider the scope and purpose of the litigation, and the rules which must be applied in its determination.

(1) The relator has invoked the original jurisdiction of this court. It is well settled that this jurisdiction will not be exercised to vindicate private or local rights regardless of their importance, but it is reserved for the use of the state itself when it appears to be necessary to vindicate or protect its prerogatives or franchises, or the liberties of its people.

"The jurisdiction," said Morgan, Ch. J. (State ex rel. Steel v. Fabrick, 17 N. D. 532, 536, 117 N. W. 860), "is not to be exercised unless the interests of the state are directly affected. Merely private rights are not enough on which to base an application for the issuance of original writs by this court. The rights of the public must appear to be directly affected. The matters to be litigated must not only be *publici juris,* but the sovereignty of the state, or its franchises or prerogatives, or the liberties of its people, must be affected. Before the court will, in the exercise of its original jurisdiction, issue prerogative writs, there must be presented matters of such strictly public concern as involve the sovereign rights of the state, or its franchises or privileges. The often-quoted statement of the rule as to the original jurisdiction of the supreme court to issue writs of a prerogative character, as given in Atty. Gen. v. Eau Claire, 37 Wis. 400, is well expressed and clear: 'To warrant the assertion of original jurisdiction here, the interest of the state should be primary and proximate, not indirect or remote; peculiar, perhaps, to some subdivision of the state, but affecting the state at large in some of its prerogatives; raising a contingency requiring the interposition of this court to preserve the prerogatives and franchises of the state in its sovereign character.' This statement of the rule has been approved in many cases in this court."

(2) While it is true that the relator in this case, in his capacity of a citizen and taxpayer of the state, has a sufficient interest to invoke this court's prerogative jurisdiction as a relator, still the real plaintiff is the state. The private relator, in his capacity as a citizen and taxpayer, merely informs the court of the infringement which has been or is about to be made upon the sovereignty of the state, or its franchises or prerogatives, or the liberties of its people, and the court by virtue of the power granted by the Constitution commands that the suit be brought by and for the state, even though the attorney general may refuse to bring this action or consent to its institution.

"This transcendent jurisdiction is a jurisdiction reserved for the use

of the state itself when it appears to be necessary to vindicate or protect its prerogatives or franchises, or the liberties of its people; the state uses it to punish or prevent wrongs to itself or to the whole people; the state is always the plaintiff and the only plaintiff, whether the action be brought by the attorney general, or, against his consent, on the relation of a private individual under the permission and direction of the court. It is never the private relator's suit; he is a mere incident; he brings the public injury to the attention of the court, and the court, by virtue of the power granted by the Constitution, commands that the suit be brought by and for the state. The private relator may have a private interest which may be extinguished (if it be severable from the public interest), yet still the state's action proceeds to vindicate the public right." State ex rel. Bolens v. Frear, 148 Wis. 456, 500, L.R.A.1915B, 569, 134 N. W. 673, Ann. Cas. 1913A, 1147.

Not only is the prerogative jurisdiction of this court invoked, but in the exercise of that jurisdiction, we are asked to declare a legislative enactment void, and restrain administrative officers of this state from performing the duties which the legislature has assigned to them by such enactment. In this case, therefore, this court is called upon to exercise the two highest powers entrusted to it by the sovereign authority—the people—under the Constitution of this state: (1) Its prerogative jurisdiction; (2) to declare invalid an act of a co-ordinate department of the government. "The power to pass upon the constitutionality of laws when the question arises in the course of ordinary litigation is a great power, one to be exercised with the greatest possible caution and wisdom; but the power to take up and pass upon a law involving the expenditure of any state funds as soon as it is passed, at the suggestion of any taxpayer, and place a judicial veto upon its execution, is a still greater one. No higher power than this can well be conceived in a government such as ours; certainly no power will demand greater wisdom in its exercise, if it exists." (State ex rel. Bolens v. Frear, 148 Wis. 456, L.R.A.1915B, 569, 134 N. W. 673, Ann. Cas. 1913A, 1147.)

"The legislative and judicial," said Cooley (Cooley, Const. Lim. 7th ed. pp. 227, 228)," are co-ordinate departments of the government, of equal dignity; each is alike supreme in the exercise of its proper functions, and cannot directly or indirectly, while acting within the limits of its authority, be subjected to the control or supervision of the other,

without an unwarrantable assumption by that other of power which, by the Constitution, is not conferred upon it. The Constitution apportions the powers of government, but it does not make any one of the three departments subordinate to another, when exercising the trust committed to it. The courts may declare legislative enactments unconstitutional and void in some cases, but not because the judicial power is superior in degree or dignity to the legislative. Being required to declare what the law is in the cases which come before them, they must enforce the Constitution as the paramount law, whenever a legislative enactment comes in conflict with it.

"But the courts sit not to review or revise the legislative action, but to enforce the legislative will; and it is only where they find that the legislature has failed to keep within its constitutional limits, that they are at liberty to disregard its action; and in doing so, they only do what every private citizen may do in respect to the mandates of the courts when the judges assume to act and to render judgments or decrees without jurisdiction. 'In exercising this high authority, the judges claim no judicial supremacy; they are only the administrators of the public will. If an act of the legislature is held void, it is not because the judges have any control over the legislative power, but because the act is forbidden by the Constitution, and because the will of the people, which is therein declared, is paramount to that of their representatives expressed in any law.' . . . It is a solemn act in any case to declare that that body of men to whom the people have committed the sovereign function of making the laws for the commonwealth have deliberately disregarded the limitations imposed upon this delegated authority, and usurped power which the people have been careful to withhold; and it is almost equally so when the act which is adjudged to be unconstitutional appears to be chargeable rather to careless and improvident action, or error in judgment, than to intentional disregard of obligation."

(3) Every reasonable presumption is in favor of the constitutionality of a statute enacted by the legislature. 8 Cyc. 801; O'Laughlin v. Carlson, 30 N. D. 213, 152 N. W. 675. This presumption is conclusive, unless it is clearly shown that the enactment is prohibited by the Constitution of the state or of the United States. (Cooley, Const. Lim. 7th ed. 242; 8 Cyc. 801.) The only test of the validity of an act regularly passed by a state legislature is whether it violates any of the

express or implied restrictions of the state or Federal Constitutions. 8 Cyc. 776; Cooley, Const. Lim. 7th ed. pp. 232–241; Re Watson, 17 S. D. 486, 97 N. W. 463, 2 Ann. Cas. 321; Ratcliff v. Wichita Union Stockyards Co. 74 Kan. 1, 6 L.R.A.(N.S.) 834, 118 Am. St. Rep. 298, 86 Pac. 150, 10 Ann. Cas. 1016; State ex rel. Nichols v. Cherry, 22 Utah, 1, 60 Pac. 1103; Ex parte Boyce, 27 Nev. 299, 65 L.R.A. 47, 75 Pac. 1, 1 Ann. Cas. 66. And he who alleges a statute to be unconstitutional must be able to point to the particular constitutional provision violated. Missouri River Power Co. v. Steele, 32 Mont. 433, 80 Pac. 1093; State v. Wilson, 124 Iowa, 264, 99 N. W. 1060; 8 Cyc. 800.

In discussing the difference between the Constitution of the United States and the Constitution of the states, as regards the legislative powers which may be exercised under them, Cooley (Cooley, Const. Lim. 7th ed. 242), said: "We look in the Constitution of the United States for grants of legislative power, but in the Constitution of the state to ascertain if any limitations have been imposed upon the complete power with which the legislative department of the state was vested in its creation. Congress can pass no laws but such as the Constitution authorizes, either expressly or by clear implication; while the state legislature has jurisdiction of all subjects on which its legislation is not prohibited. 'The lawmaking power of the state,' it is said in one case, recognizes no restraints and is bound by none except such as are imposed by the Constitution. That instrument has been aptly termed a legislative act by the people themselves in their sovereign capacity, and is therefore the paramount law. Its object is not to grant legislative power, but to confine and restrain it. Without the constitutional limitations, the power to make laws would be absolute. These limitations are created and imposed by express words or arise by necessary implication."

Under our Constitution "all governmental power is vested in the legislature, except such as is granted to the other departments of the government, or expressly withheld from the legislature by constitutional restrictions." State ex rel. Standish v. Boucher, 3 N. D. 389, 395, 21 L.R.A. 539, 56 N. W. 142, 144; O'Laughlin v. Carlson, 30 N. D. 213, 152 N. W. 675.

Bearing these well-known principles in mind, we approach the questions presented for our determination in this case.

It is true as relator's counsel asserts that an act establishing a state bonding department adopted by the legislature of this state in 1913 was held to be unconstitutional by this court in State ex rel. Miller v. Taylor, 27 N. D. 77, 145 N. W. 425. It is also doubtless true, as relator's counsel contends, that the present act was adopted for the purpose of accomplishing the same object sought to be accomplished by the former act, and that the changes in the present act were intended to obviate the constitutional violations adjudged to exist in the former act. These facts, however, do not change the rules which must be applied in determining the constitutionality of the statute under consideration. The legislators who enacted the present act were sworn to support both the state and Federal Constitutions, and to faithfully discharge their duties of office. They are presumed to have performed their sworn duty. These legislators knew the constitutional objections to the former act. We cannot presume that (possessed of this knowledge) they intentionally enacted a law violative of the Constitution. The presumption is that they enacted a valid and constitutional law.

Relator's counsel, also, condemns the present act as a piece of unwise and ineffective legislation, and asserts that improper motives on the part of the legislators (or some of them) caused its enactment. In relator's brief it is said that "this piece of legislation comes to us in a form and under circumstances that call for no sympathy, nor is it deserving of any generosity of construction. This legislative child is a hopeless physical cripple and a moral degenerate from the time of its birth, and must have been conceived because of personal desires of revenge or like ulterior motives, because its author has apparently deliberately sent it forth with the intent that its body should be deformed to the extent that it cannot properly move, and the wrong which it is claimed to remedy is permitted to be exercised against the very persons whom it is claimed it is designed to protect." It is therefore asserted that "little weight should be given to any asserted claim that this is salutory, beneficial, or effective legislation." And "that no sympathy is to be extended by way of construction to this wholly ineffective piece of legislation which can only be termed  .  .  .  a physical cripple."

(4) The courts are not concerned with the wisdom, necessity, or expediency of legislation. These are matters for the legislature. 8 Cyc. 776, 851. The motives of the legislators cannot be inquired into

in determining the constitutionality of a statute. "Ignorance or improper motives in the enactment of legislation are never imputed to the legislature. The courts will conclusively presume that no general laws are ever passed either through want of information on the part of the legislature, or because it was misled by false representations of interested parties; and a statute which violates, neither expressly nor by necessary implication, any constitutional provision, is itself conclusive evidence of its propriety and justice." 8 Cyc. 804, 851.

While the motives of the legislators are not subject to judicial inquiry in determining the validity of legislation, it may be mentioned that the act under consideration was first passed in the state senate by a vote of forty-one ayes to five nays, three being absent and not voting. It thereafter passed the house of representatives, with certain amendments, by a vote of seventy-four ayes to twenty-one nays, seventeen being absent and not voting; and on its return to the senate, the act, as amended by the house of representatives, was passed by the senate by a vote of thirty-six ayes to ten nays, three being absent and not voting.

(5) It is contended that the statute under consideration is invalid as an unwarranted delegation of judicial power to the state examiner, and the commissioner of insurance. This court sustained a similar objection to the 1913 act, and held the same invalid "as an unwarranted delegation of judicial power to purely administrative officials, in that it commits to the commissioner of insurance the sole right to determine the amount due subdivisions whose officials are insured, by reason of any default or violation of official duties, and also delegates to the auditing board the power to determine when bonds of insured officials shall be canceled, which are judicial functions."

The present act contains the following provisions:

"Section 10. All such official bonds shall run to the political subdivision of which the bonded official is an officer, as obligee, and such bonds shall be construed as provided in § 680 of the Compiled Laws of North Dakota 1913, and any private corporation or person suing such official may recover under such bond and have the protection of the state bonding fund.

"Section 11. Any obligee or private corporation or person may sue upon any such official bond issued by the commissioner of insurance and may join the commissioner of insurance as a codefendant with the

defaulting officer and in case judgment is obtained against such defaulting officer, the judgment shall further specify that such judgment shall be paid out of any funds on hand in the state bonding fund, or that may thereafter accrue to such fund. In case a judgment is paid out of the state bonding fund in any such action, the state bonding fund shall be subrogated under the judgment to the right of the judgment creditor to recover against the defaulting officer. In all proceedings to enforce such right of subrogation the commissioner of insurance as nominal defendant shall act for and in behalf of the state bonding fund; and he may in any action or proceedings appeal from any appealable order or from any judgment against said state bonding fund the same as is provided for other parties to civil actions.  .  .  .

"Section 13.   The bonds issued in pursuance of this act shall be construed and held to inure to the benefit of not only the political subdivisions named as obligee, but also to the benefit of any person damaged by any wrongful act or omission of the bonded official; and any person so damaged may, in an action upon the bond brought in his own name as plaintiff against the official bonded, join the commissioner of insurance as a codefendant, and thereby subject the state bonding fund to the payment of any judgment so obtained.  .  .  .

"Section 15.   Whenever a loss shall occur in any county, city, village, township or school district by the default of any officer of the same whose fidelity has been insured under the provisions of this act, it shall be the duty of the county auditor, city auditor, village, township or school district clerk or treasurer in case the defaulting officer is the auditor or clerk, as the case may be, immediately to notify the commissioner of insurance.   The commissioner of insurance shall thereupon notify the state examiner; and it shall be the duty of the state examiner when so notified to check the accounts of such defaulting official and file a report with the commissioner of insurance.

"Section 16.  .  .  .   In case there shall not be a sufficient amount in the state bonding fund to pay the losses sustained after the reservation of funds to cover clerical assistance and other incidental expenses for the conduct of the bonding department for the year, such losses shall be paid as soon as sufficient funds are accumulated in the State Bonding Fund by collection of premiums.  .  .  .

"Section 20.   In case any official shall default, it shall be the duty of

the state examiner immediately to check the accounts of such defaulting official and file a report with the commissioner of insurance stating the amount due upon such defaulting officer's bond and for such services he shall be paid out of the state bonding fund, the same fees as he is paid for examining the accounts of county officers.

"Section 21. If at any time the commissioner of insurance shall be of the opinion that the interests of the state bonding fund are jeopardized by the misconduct or inefficiency of any bonded official, it-shall be his duty to cause an action for an accounting to be instituted against such bonded official for the purpose of requiring a complete disclosure of the business of the office of which such official is an incumbent. Such action shall be brought in the name of the commissioner of insurance as plaintiff and the court may in such action interplead the obligee and render such judgment as shall protect the rights of all parties concerned. If at any time the commissioner of insurance deems it advisable, it shall be his duty to make a complaint to the governor requesting the governor to institute an investigation with the purpose of removing from office any defaulting official or any official who so conducts the affairs of his office as to endanger the state bonding fund. . . .

"Section 23. When any official applies to the commissioner of insurance for the issuance to him of an official bond, the commissioner of insurance may, after due investigation, reject such application if in his judgment the interests of the state bonding fund require such action. In such case the official whose application is rejected may secure a bond executed either by private surety or by a duly authorized surety company, but no officer or board of any political subdivision shall have the power to disburse public funds to pay the premium on such bonds.

"Section 24. The commissioner of insurance shall immediately notify the applicant of such rejection by registered mail, and the applicant shall have twenty days after the receipt of such notice within which to take an appeal from such decision of the commissioner of insurance to the district judge of the judicial district in which the applicant resides. The judge of said court shall hear such appeal at a day to be fixed by him not less than ten nor more than thirty days after the filing of the appeal with the clerk. The case shall be tried by the court without a jury. Notice of such appeal shall be served by the appellant upon the commissioner of insurance."

Do these provisions delegate unwarranted judicial powers to the state examiner and commissioner of insurance in violation of the constitutional inhibition? We think not. The state can act only through its officers. If the bonding fund sought to be established by the legislature is to be operated at all, such operation necessarily must be carried on through some officer or officers. The commissioner of insurance is the officer to whom the duty has been assigned to operate the state bonding fund. Actions upon claims against the bonding fund are maintainable against him; and he may also institute certain actions in behalf of the state bonding fund. It is self-evident that, in order to properly defend or maintain such actions, and intelligently perform the duties assigned to him, the commissioner of insurance must obtain the necessary preliminary information. To obtain such information it would frequently, or generally, be necessary to have the books and accounts of the defaulting officer examined and audited. This is obviously proper work for an expert accountant. The need of an expert accountant to examine the books and accounts of the various state officials and state institutions, as well as the books and accounts of county and city officers, banks and trust companies, has long been recognized, and the state has provided such expert accountant in the state examiner.

The act under consideration merely provides that the state examiner shall, when notified by the commissioner of insurance, check the accounts of the defaulting official and file a report of his examination with the commissioner of insurance. The findings of the state examiner are not made binding upon anyone. They are not even given any specific or unusual evidentiary force or effect. The state examiner's report is merely intended for the information of the commissioner of insurance. The duties and powers conferred upon the state examiner under the provisions of this act are no more judicial in character, and call for the exercise of no different powers, than those which he is required to exercise in the discharge of his usual duties, in examination of the books and accounts of the various state officials, state institutions, municipal officers, and banks, trust companies, and other corporations which are subject to examination by him under the laws of this state. Nor is the commissioner of insurance invested with power to make a binding determination upon any claims or rights which may arise in favor of, or against, the state bonding fund, but the legislature has

expressly reserved to every person and municipality the right to obtain a judicial determination of any question of a judicial or quasi judicial nature which may arise in the transactions with the commissioner of insurance in his administration of the state bonding fund.

It is true the people of this state, through their Constitution, have created three co-ordinate departments of government, each supreme in its own sphere, and that the judicial power is vested in the courts. This, however, does not necessarily mean that every act involving the exercise of judgment upon law and fact must be submitted to a court in the first instance. Many boards are permitted to exercise such judgment. In fact there are few, if any, administrative boards or officers who are not at times required (in the first instance), to exercise such judgment. Thus a board of drain commissioners is permitted to determine (among other things) (1) whether there is sufficient cause for the petition for a proposed drain; or whether the cost of the proposed drain will exceed the amount of benefit to be derived therefrom; (2) what lands are benefited by the construction of the drain, and apportion the cost thereof to the lands benefited, according to the benefits. This court has said that the drain commissioners, in performing these acts, are exercising functions judicial or quasi judicial in their nature. (State ex rel. Dorgan v. Fisk, 15 N. D. 219, 107 N. W. 191; Bergen Twp. v. Nelson County, — N. D. —, 156 N. W. 559.) And this court has also said that "the legislature had the undoubted power to commit to the drainage board the ascertainment of the lands to be assessed, as well as the apportionment of benefits." Erickson v. Cass County, 11 N. D. 494, 507, 92 N. W. 841.

The auditing of claims against a public corporation is generally considered a quasi judicial act. 28 Cyc. 1750; State ex rel. Barber Asphalt Paving Co. v. District Ct. 90 Minn. 457, 97 N. W. 132. Still the power to pass upon, and allow or disallow, claims is generally conferred upon some administrative board or body. 28 Cyc. 1748 et seq. Thus in this state, claims against the state are audited by the state auditing board; claims against a county by the board of county commissioners; and claims against a city by the city council. These respective boards determine in the first instance whether a claim presented constitutes an obligation against the public corporations they represent. If there is no dispute as to the claim, it is ordered paid; and

except in unusual cases, as when the officers have acted fraudulently, the matter ends there, and no further determination of the validity of amount of the claim is required. If a claim is rejected, the claimant is given the right to obtain an adjudication by a judicial tribunal.

Not only has the performance of these and similar duties been recognized in this state as a proper function of administrative boards or officers (and we are aware of no instance wherein the power so conferred has been challenged as an unwarranted delegation of judicial power), but it has even been provided by our statute that a claim against a city for personal damages or injuries by reason of defective streets, sidewalks, etc., must be presented to the city authorities within a limited time from the happening of the injury, and that no action can be maintained against the city unless such claim has first been presented as provided by law. Comp. Laws 1913, §§ 3627, 3628. See also Coleman v. Fargo, 8 N. D. 69, 76 N. W. 1051; Johnson v. Fargo, 15 N. D. 525, 108 N. W. 243, 20 Am. Neg. Rep. 460; Pyke v. Jamestown, 15 N. D. 157, 107 N. W. 359; Tonn v. Helena, 42 Mont. 127, 36 L.R.A. (N.S.) 1136, 111 Pac. 715, 3 N. C. C. A. 437.

The same departments of government created by, and the same distribution of governmental power made in, the Constitution of this state, were also created by, and made in, the Federal Constitution. In the case of Den ex dem. Murray v. Hoboken Land & Improv. Co. 18 How. 272, 279, 15 L. ed. 372, 376, the United States Supreme Court was called upon to determine whether an act which authorized the treasury department through its proper officers to audit the accounts of a collector of customs, ascertain the balance due from such collector to the government, and issue a distress warrant therefor, delegated judicial powers in violation of the Constitution. In considering this point the court said: "In support of this position, the plaintiff relies on that part of the 1st section of the 3d article of the Constitution which requires the judicial power of the United States to be vested in one supreme court and in such inferior courts as Congress may, from time to time, ordain and establish; the judges whereof shall hold their offices during good behavior, and shall, at stated times, receive for their services a compensation which shall not be diminished during their continuance in office. . . .

"It must be admitted that, if the auditing of this account, and the ascertainment of its balance, and the issuing of this process, was an

exercise of the judicial power of the United States, the proceeding was void; for the officers who performed these acts could exercise no part of that judicial power. They neither constituted a court of the United States, nor were they, or either of them, so connected with any such court as to perform even any of the ministerial duties which arise out of judicial proceedings.

"The question whether these acts were an exercise of the judicial power of the United States can best be considered under another inquiry, raised by the further objection of the plaintiff, that the effect of the proceedings authorized by the act in question is to deprive the party, against whom the warrant issues, of his liberty and property 'without due process of law;' and therefore is in conflict with the 5th article of the Amendments of the Constitution.  .  .  .

"That the auditing of the accounts of a receiver of public moneys may be, in an enlarged sense, a judicial act, must be admitted.  So are all those administrative duties the performance of which involves an inquiry into the existence of facts and the application to them of rules of law.  In this sense the act of the President in calling out the Militia under the act of 1795 (Martin v. Mott, 12 Wheat. 19, 6 L. ed. 537), or of a commissioner who makes a certificate for the extradition of a criminal, under a treaty, is judicial.  But it is not sufficient, to bring such matters under the judicial power, that they involve the exercise of judgment upon law and fact.  United States v. Ferreira, 13 How. 40, 14 L. ed. 42.  .  .  .  We do not doubt the power of Congress to provide by law that such a question shall form the subject-matter of a suit in which the judicial power can be exerted.  The act of 1820 makes such a provision for reviewing the decision of the accounting officers of the treasury.  But, until reviewed, it is final and binding; and the question is whether its subject-matter is necessarily, and without regard to the consent of Congress, a judicial controversy.  And we are of opinion it is not.  .  .  .

"To avoid misconstruction upon so grave a subject, we think it proper to state that we do not consider Congress can  .  .  .  withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.  .  .  .  At the same time there are matters involving public rights, which may be presented in such form that the judicial power is capable of acting on

them, and which are susceptible of judicial determination, but which Congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper."

And in the recent case of Ocampo v. United States, 234 U. S. 91, 58 L. ed. 1231, 34 Sup. Ct. Rep. 712, an act conferring upon the prosecuting attorney power to investigate charges of crimes in lieu of preliminary examination before a magistrate was held not to be an unconstitutional delegation of judicial power. The court said: "It is insisted that the finding of probable cause is a judicial act, and cannot properly be delegated to a prosecuting attorney. We think, however, that it is erroneous to regard this function, as performed by committing magistrates generally, or under General Orders, No. 58, as being judicial in the proper sense. There is no definite adjudication. A finding that there is no probable cause is not equivalent to an acquittal, but only entitles the accused to his liberty for the present, leaving him subject to rearrest. . . . In short, the function of determining that probable cause exists for the arrest of a person accused is only quasi judicial, and not such that, because of its nature, it must necessarily be confided to a strictly judicial officer or tribunal." See also Cunningham v. Northwestern Improv. Co. 44 Mont. 180, 119 Pac. 554, 565, 1 N. C. C. A. 720; Monongahela Bridge Co. v. United States, 216 U. S. 177, 54 L. ed. 435, 30 Sup. Ct. Rep. 356; Borgnis v. Falk Co. 147 Wis. 327, 37 L.R.A.(N.S.) 489, 133 N. W. 209, 3 N. C. C. A. 649; Com. v. Libbey, 216 Mass. 356, 49 L.R.A.(N.S.) 879, 103 N. E. 923, Ann. Cas. 1915B, 659; Bushnell v. Leland, 164 U. S. 684, 41 L. ed. 598, 17 Sup. Ct. Rep. 209.

(6) The contention that the act is void as a matter of public policy is untenable. The declaration of the public policy of the state is generally a matter for legislative consideration. The only limits upon the legislative power in determining such policy are those fixed in the state and Federal Constitutions. See Northern P. R. Co. v. Richland County, 28 N. D. 172, L.R.A.1915A, 129, 148 N. W. 545; 6 Words & Phrases, 5813, et seq.; 4 Words & Phrases, 2d series, 27, et seq. See also State v. Coyle, 3 Okla. Crim. Rep. 50, 122 Pac. 243; McAllister v. Fair, 72 Kan. 533, 3 L.R.A.(N.S.) 726, 115 Am. St. Rep. 233, 84 Pac. 112, 114, 7 Ann. Cas. 973; Vidal v. Philadelphia, 2 How. 127, 197, 11 L. ed. 205, 233; State ex rel. Starke County v. Laramore, 175

Ind. 478, 94 N. E. 761, Ann. Cas. 1913B, 1296; Schultz v. State, 89 Neb. 34, 33 L.R.A.(N.S.) 403, 130 N. W. 972, Ann. Cas. 1912C, 495; Allen v. Smith, 84 Ohio St. 283, 95 N. E. 829, Ann. Cas. 1912C, 611; Perkins v. Heert, 158 N. Y. 306, 43 L.R.A. 858, 70 Am. St. Rep. 483, 53 N. E. 18; 29 Am. & Eng. Enc. Law, 2d ed. 569.

Ruling Case Law (6 R. C. L. § 108), states the law to be as follows: "It is generally recognized that the public policy of a state is to be found in its Constitution and statutes, and only in the absence of any declaration in these instruments may it be determined from judicial decisions. In order to ascertain the public policy of a state in respect to any matter, the acts of the legislative department should be looked to, because a legislative act, if constitutional, declares in terms the policy of the state, and is final so far as the courts are concerned. All questions of policy are for the determination of the legislature, and not for the courts; and there is no public policy which prohibits the legislature from doing anything which the Constitution does not prohibit. Hence the courts are not at liberty to declare a law void as in violation of public policy. . . . Where courts intrude into their decrees their opinion on questions of public policy they in effect constitute the judicial tribunals as lawmaking bodies in usurpation of the powers of the legislature."

In Julien v. Model Bldg. Loan & Invest. Asso. 116 Wis. 79, 61 L.R.A. 668, 92 N. W. 561, the supreme court of Wisconsin said: "We know of no ground upon which a constitutional legislative enactment can be rightly spoken of as contrary to public policy. What is and what is not public policy must obviously be determined by the written and the unwritten law, giving precedence to the former where the two are in conflict. . . . Laws are never said to be contrary to public policy in any other sense than contrary to constitutional policy. . . . Statutes are not tested by any rule of public policy. We look to the statutes as well as the unwritten law to determine what is and what is not public policy, and then we test acts *inter partes* by the result. If such acts are not directly the subject of legislation, we say they are contrary to public policy. When we leave constitutional limitations out of view, the will of the legislative branch of the government, when expressed, is the highest evidence of public policy. To judicially condemn its expressed will, when exercised within constitutional limitations, would be

the plainest kind of usurpation. . . . It is the province of the statesman, and not of the lawyer, to discuss, and of the legislature to determine what is best for the public good, and to provide for it by proper enactments. It is the province of the judge to expound the law, to declare public policy as he finds it in the unwritten and written law. Public policy is a proper ground for a decision only in the sense of the policy of the law, not in the sense of mere judicial notions as to what is best for the public good."

"All political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people." (N. D. Const. § 2.) The executive, legislative, and judicial departments were created by the people through their Constitution to exercise the powers and perform the duties expressly or by necessary implication, conferred or imposed, by the Constitution. The officials designated, or authorized, by the people in the Constitution to operate the departments of government, are public servants, required to perform such service as the Constitution says they shall perform, and as the people through their Constitution have authorized their lawmaking representatives to impose upon them. And there are no powers inherent in any of the branches (executive, legislative, or judicial), nor duties to be evaded by any of them, "if such powers have been expressly withheld from it by the people, or duties have been imposed upon it by them; and therefore no duty can be evaded by the executive or judiciary if the people have authorized its imposition by the legislature, their lawmaking power on either of these branches." Kermott v. Bagley, 19 N. D. 345, 124 N. W. 397. The legislature has imposed no duty upon the courts under the state bonding fund act which might not be so imposed. See Kermott v. Bagley, supra. See also Interstate Commerce Commission v. Brimson, 154 U. S. 447, 38 L. ed. 1047, 4 Inters. Com. Rep. 545, 14 Sup. Ct. Rep. 1125.

(7–9) It is next contended that the act is invalid because it delegates unwarranted legislative powers to the commissioner of insurance and state auditing board. This objection is directed at § 14 of the act, which reads as follows: "It shall be the duty of the commissioner of insurance and the state auditing board to estimate at the beginning of each year the amount required for additional clerical help and incidental office expenses made necessary by the additional work devolving upon his

33 N. D.—7.

office on account of the provisions of this act for that year, which estimated amount shall be reserved from the premiums paid in and shall not exceed the sum of $1,500 per annum. The amount of premium receipts remaining shall be used for the payment of losses; *provided* that if the amount reserved for clerical assistance and incidental expenses is more than sufficient to pay the same the excess shall be used to pay losses. The commissioner of insurance shall have the authority to engage clerical assistance to conduct the transactions provided for by this act. He shall also prepare and provide the necessary blanks, books, stationery and postage and cause the same to be delivered to the proper officers and persons. Such expenses and the salaries of such clerical assistance shall be audited and allowed by the state auditing board."

A similar objection was made to the 1913 act. The objection was sustained on the ground that the act then under consideration attempted "to give to the commissioner of insurance the arbitrary power to determine how much of such fund shall be applied to the payment of losses, and how much to the payment of deputies, clerk hire, and other expenses of the department, and, particularly, because no limitation is placed upon the amount which may be devoted to the last-mentioned subject." (See State ex rel. Miller v. Taylor, 27 N. D. 78, 84, 145 N. W. 425.)

Relator contends that the amount (not exceeding $1,500), authorized to be expended "for clerical help and incidental office expenses" under the provisions of § 14 of the present act, applies only to salaries of clerks and incidental expenses connected with the office, and does not apply to other necessary expenses of organizing and operating the bonding fund, such as blanks, books, and stationery. And the relator contends that with respect to such latter expenses, the commissioner of insurance is given an unlimited authority to expend any amount of money which he may desire, and that therefore the decision of this court in holding the former act unconstitutional as an unwarranted delegation of legislative powers applies equally to the present act.

The province of the courts is to construe and interpret laws,—not to make them. If the language of a statute is clear and unambiguous, there is no room for construction, and the legislature must be presumed to have intended to say what it said. 36 Cyc. 1106, 1107; 26 Am. & Eng. Enc. Law, 598. This is so, even though the statute so understood

"leads to absurd and mischievous results . . .; for courts are not to inquire as to the motive of the legislature, nor to depart from a meaning clearly conveyed in unambiguous words, because the statute, as literally understood, appears to lead to unwise consequences or to contravene public policy." (26 Am. & Eng. Enc. Law, 599.) Construction or interpretation becomes necessary only in cases where an act is ambiguous or of doubtful meaning. The object of all interpretation and construction of statutes is to ascertain and give effect to the intention of the legislature. 36 Cyc. 1106; 26 Am. & Eng. Enc. Law, 597.

In order to ascertain the legislative intent it is proper to consider the occasion and necessity of the enactment, the defects or evils of the former law, and the mischief sought to be prevented or cured by the new legislation. "For this purpose the court should put itself in the place, at the time of its enactment, of the legislature which passed it, investigating the then existing state of the common or statutory law on the subject, contemporaneous circumstances, and the external or historical facts which led to its enactment, and make such application of the provisions of the statute as will best promote the object of the legislation. But it has been declared that it is only when the statute or its phraseology is ambiguous and such as to admit of two meanings that a historical investigation of this kind is permissible." (26 Am. & Eng. Enc. Law, 2d ed. 632. See also 36 Cyc. 1110.) The present law was enacted by the legislature to accomplish the purpose sought to be accomplished by the former act. It was introduced by the same senator who introduced the former act. It is presumed that the legislature, in passing the statute under consideration, "acted with a full knowledge of the constitutional scope of its powers, of prior legislation on the same subject, and its construction by the courts." 36 Cyc. 1135. See also 36 Cyc. 1153. It is presumed that the legislature intended to enact a valid law. And, therefore, when a statute is susceptible of two constructions, one of which will render it valid and another which will render it unconstitutional and void, the former construction will be adopted. 26 Am. & Eng. Enc. Law, 640; Cooley, Const. Lim. 255. These well-known rules are peculiarly applicable to the statutory provision under consideration. And by applying these rules, we reach the conclusion that the legislature did not intend to authorize the commissioner of insurance to expend to exceed $1,500 per annum for all

expenses in his office, inclusive of clerical assistance and office supplies for operation of the state bonding fund.

(10) The relator next contends that it would be impossible to operate the state bonding fund for $1,500 per year, and that this limitation upon operating expenses will render the act "wholly ineffective, inoperative, and impossible of performance because of lack of means and funds to conduct the same." The objection does not rest on constitutional grounds. It is not contended that any specific constitutional provision has been violated. The objection merely goes to the wisdom and policy of the legislation. The moneys to be expended in executing or administering a legislative enactment is peculiarly a matter for legislative determination. It is presumed that the legislature informed itself on the subject, and for reasons satisfactory to its judgment determined the amount of necessary operating expenses, and fixed the maximum thereof at $1,500 per annum. See 6 R. C. L. §§ 111–113. With the wisdom of this legislation we are not concerned. The responsibility therefore rests upon the legislature, and not upon the courts; and it is difficult to see why the relator should complain because the legislature was too parsimonious in the allowance of operating expenses. If anyone has cause for complaint, it would be the commissioner of insurance, whose duty it is to operate the department. He, however, does not complain. But in his return herein he admits that he is about to perform the duties prescribed by the act; denies that the act is unconstitutional for any of the reasons assigned by the relator; he further admits "that he is permitted to employ clerks and servants to conduct the additional labor imposed upon his office by said act, and he is further authorized to prepare the necessary blanks, books, stationery, and postage; but alleges that the amount to be expended for such purposes is limited and fixed by the terms of the act."

(11) The relator also asserts that "the act deprives citizens of the state of the constitutional right of due process of law in requiring the appointment of an attorney in fact upon whom service of judicial process may be made." This objection is predicated upon § 9 of the act, which reads as follows: "The officer to be bonded shall, prior to the execution of such bond, execute and file in the office of the commissioner of insurance, an instrument appointing the commissioner of insurance, and his successors, his true and lawful attorney upon whom all

process in any action or proceeding against such officer may be served, and therein shall agree that any process which may be served upon his said attorney shall be of the same force and validity as if served on him personally, and that the authority thereof shall continue in force, irrevocably so long as any liability of such official or of such state bonding fund remains. In actions upon such bond when the sheriff files his return that he is unable, after diligent search, to find such bonded officer for the purpose of serving the summons, service upon the commissioner of insurance shall be deemed and held to be personal service upon such bonded official. Whenever process against any such bonded official shall be served upon the commissioner of insurance, he shall forthwith mail a copy of such process, postage prepaid, directed to such bonded official at the residence of such official stated in such instrument. The commissioner shall keep a record of all such process which shall show the time and hour of service."

The relator says that this section "takes away from every citizen who happens to be an office holder and whose official acts have been questioned either rightfully or wrongfully, the right of . . . having process served personally upon him, one of the most valuable rights which are accorded to the citizen by the Constitution."

Relator's counsel assumes that the provision under consideration dispenses with personal service upon the principal (the officer bonded), in all actions upon claims arising under the state bonding fund act. The act is not susceptible of this construction. It clearly contemplates personal service upon the officer bonded the same as in all other actions, where such service may be had. The provision for service upon the commissioner of insurance as attorney becomes applicable only "in actions upon such bond when the sheriff files his return that he is unable, after diligent search, to find such bonded officer for the purpose of serving the summons."

Obviously the only persons whose rights are affected or whose property may be taken are the municipal officers who hereafter may procure official bonds under the provisions of the state bonding fund act. And the rights of such officers could be affected only in a case wherein it was sought to obtain and enforce against them or their property a personal judgment based upon service of process made upon the commissioner of insurance as attorney. Whether an officer could in any event success-

fully maintain the objection sought to be raised by the relator we are not called upon to determine. The relator is not an officer, and his rights are not, nor are the rights of the state, or any of its municipalities or citizens, generally affected. The rights of claimants to maintain actions and establish their claims against the state bonding fund are not affected, nor are the rights of the commissioner of insurance to defend such actions lessened or impaired. It is a firmly settled principle of law that a court will not listen "to an objection made to the constitutionality of an act by a party whose rights it does not affect, and who has therefore no interest in defeating it." Cooley, Const. Lim. 7th ed. 232.

Cyc. (8 Cyc. 788) states the rule thus: "All constitutional inhibition against the taking of private property without due process of law, and all constitutional guaranties of equal rights and privileges, are for the benefit of those persons only whose rights are affected, and cannot be taken advantage of by any other persons."

"A person who is seeking to raise the question as to the validity of a discriminatory statute has no standing for that purpose unless he belongs to the class which is prejudiced by the statute." (6 R. C. L. § 89.) And "where the class which includes the party complaining is in no wise prejudiced the general rule is that it is immaterial whether a law discriminates against other classes, or denies to other persons equal protection of the laws." (6 R. C. L. § 88.) But "a member of a particular class which may be discriminated against does not necessarily have the right to champion any grievance of that entire class in the absence of any actual interest which is prejudiced or impaired by the statute in question." (6 R. C. L. § 90.) This principle has repeatedly been announced by this court. State v. McNulty, 7 N. D. 169, 73 N. W. 87; State ex rel. McClory v. Donovan, 10 N. D. 203, 86 N. W. 709; Turnquist v. Cass County Drain Comrs. 11 N. D. 514, 92 N. W. 852; Ely v. Rosholt, 11 N. D. 559, 93 N. W. 864; State v. Stevens, 19 N. D. 249, 123 N. W. 888.

In State v. McNulty, 7 N. D. 169, 73 N. W. 87, a search warrant had been issued under the provisions of the state prohibition law for the seizure of all property in a certain building. Part of the building was occupied as a hotel, and the defendant claimed that the warrant and the statute under which it was issued were invalid for the reason

that the property of guests in the hotel might be taken without due process of law. In disposing of this contention this court said: "In law, it can make no . . . difference to him whether the property of third persons is seized or not. It is a well-established and wholesome rule of law that no one can take advantage of the unconstitutionality of any provision who has no interest in and is not affected by it." No court has applied this principle with greater force than the Federal Supreme Court. See Clark v. Kansas City, 176 U. S. 114, 44 L. ed. 393, 20 Sup. Ct. Rep. 284; Aluminum Co. v. Ramsey, 222 U. S. 251, 56 L. ed. 185, 32 Sup. Ct. Rep. 76, 1 N. C. C. A. 251; Collins v. Texas, 223 U. S. 288, 56 L. ed. 439, 32 Sup. Ct. Rep. 286; Standard Stock Food Co. v. Wright, 225 U. S. 540, 56 L. ed. 1197, 32 Sup. Ct. Rep. 784; Jeffrey Mfg. Co. v. Blagg, 235 U. S. 571, 59 L. ed. 364, 35 Sup. Ct. Rep. 167, 7 N. C. C. A. 570; Tyler v. Registration Ct. Judges, 179 U. S. 405, 45 L. ed. 252, 21 Sup. Ct. Rep. 206; See also State v. Kirby, 34 S. D. 281, 148 N. W. 533; Jensen v. Southern P. Co. 215 N. Y. 514, L.R.A.1916A, 403, 109 N. E. 600; Cram v. Chicago, B. & Q. R. Co. 85 Neb. 586, 26 L.R.A.(N.S.) 1028, 123 N. W. 1045, 19 Ann. Cas. 170, and valuable note commencing at page 175 in latter report.

(12) No person is required to obtain an official bond from the state bonding fund. A bond executed by personal sureties or by a surety company may still be furnished as before. The act exacts the same requirement from all officers accepting the benefits thereof. Whether any person who accepts the benefits of the state bonding fund act can subsequently be heard to say that any of its provisions are invalid, we do not determine, because that question is not properly before us in this action. Obviously this court should not decide questions abstractly, or speculate upon the proper decision of issues which may never arise. The extent of inquiry in an original proceeding in the supreme court was recently considered by the supreme court of Wisconsin in State ex rel. Bolens v. Frear, 148 Wis. 456, L.R.A.1915B, 569, 134 N. W. 673, 135 N. W. 164, Ann. Cas. 1913A, 1147. That was an original proceeding assailing the constitutionality of the state income tax law. The court held that "in such an action only those questions will be determined which may be considered as relating to the validity of the whole act, leaving for future consideration, as concrete cases

may arise, the questions relating to the validity of minor provisions as
to matters of detail." The court declined to decide in that action
whether national banks or public officers could be constitutionally sub-
jected to the payment of such tax. See also State ex rel. Arpin v.
Eberhardt, 158 Wis. 20, 147 N. W. 1016; Hunter v. Colfax Consol.
Coal Co. — Iowa, —, L.R.A.—, —, 154 N. W. 1037; State ex rel. Mar-
tin v. Howard, 96 Neb. 278, 147 N. W. 689, 695; State ex rel. Lenhart
v. Hanna, 28 N. D. 583, 149 N. W. 573; Phœnix R. Co. v. Geary, 239
U. S. 277, 60 L. ed. 287, 36 Sup. Ct. Rep. 45; Minsinger v. Rau,
236 Pa. 327, 84 Atl. 902, Ann. Cas. 1913E, 1324; Flint v. Stone
Tracy Co. 220 U. S. 107, 55 L. ed. 389, 31 Sup. Ct. Rep. 342, Ann.
Cas. 1912B, 1312.

(13) It is next asserted that the act contains wrongful and unlawful
discriminations and arbitrary classifications, and therefore contravenes
§ 11 of the state Constitution, which reads: "All laws of a general
nature shall have a uniform operation." This objection is directed at
the following provisions of the act:

"Section 2 . . . No such bonds shall be issued . . . for
the bonding of any official for a greater amount than $50,000; and any
official required by law to be bonded in any greater amount than $50,-
000, shall be bonded in the sum in excess of $50,000 with a duly au-
thorized surety company or by personal sureties. The premiums on
such excess bonds, except in the case of personal sureties, shall be
paid out of the county, village, city, town, school district, or township
treasury as the case may be."

Section 3: "The premium of such bonds shall be 25 cents per hun-
dred dollars per year on all bonds issued. Such premium shall be paid
in advance by the proper authorities of each county, city, town, village,
school district or township, from its respective treasury to the state
treasurer, who shall issue receipts therefor as hereinafter provided.
The minimum on small bonds and short term officers' bonds shall not
be less than $2.50."

The specific objection is: (1) That the duties, obligations, dangers,
and risks of the various officers to be bonded are of such different degrees
that different premiums should be charged: and (2) that any county
whose treasurer is required to furnish bonds in excess of $50,000 will be

compelled to pay an excessive rate for the bond required in excess of $50,000.

The Constitution neither requires municipal officers to furnish official bonds, nor does it exempt them from so doing. In absence of such constitutional provisions, it is generally held that the legislature has the right to require such officers to furnish bonds. 29 Cyc. 1375 et seq. See also Dill. Mun. Corp. 5th ed. §§ 97–103, 394–396, 433. In such case the legislature (within the limits of its constitutional authority) may also determine what officers shall furnish such bonds, and the amounts and conditions thereof. The legislature of this state has designated the officers required to furnish bonds, and prescribed the conditions and amounts thereof. Comp. Laws 1913, §§ 660, 663, et seq.) In 1899 the legislature enacted a law providing that every county treasurer must furnish a surety bond, and that the amount of the premium therefor shall be audited and paid out of the general fund of the county. (Comp. Laws 1913, § 664.) And in 1903 the legislature enacted another law providing that whenever any county, township, city, village, or school-district officer thereafter elected shall be required by law to give or furnish a bond for the faithful performance of his duties, such bond may be executed by some responsible surety company authorized to do business in the state; and that the premium for such bond shall be audited and paid out of the general fund of the county, township, city, or school district, as the case may be, for whose benefit the same is given. (Comp. Laws 1913, § 669.) These statutory provisions have remained in force ever since they became effective.

The amount of official bonds to be furnished by the various county officers as fixed by the legislature in no instance exceeds $50,000 in amount, nor can any county officer be required to furnish a bond exceeding this amount, except the sheriff, coroner, and county treasurer, which officers are required to furnish bonds in a penal sum to be fixed by the board of county commissioners. Each of these officers, therefore, may be required, upon direction by the county commissioners, but not otherwise, to furnish a bond in excess of this amount. As already stated, the requirement that municipal officers furnish official bonds depends solely upon legislative enactment. The legislature could have provided that no municipal officer should be required to furnish a bond in an

amount exceeding $50,000; or it could have dispensed with such bonds altogether.

The constitutional provision invoked by the relator was first construed by this court in Vermont Loan & T. Co. v. Whithed, 2 N. D. 82, 49 N. W. 318. In that case this court, speaking through Mr. Justice Bartholomew, said: "The uniform operation required by this provision does not mean universal operation. A general law may be constitutional, and yet operate in fact only upon a very limited number of persons or things, or within a limited territory. But, so far as it is operative, its burdens and benefits must bear alike upon all persons and things upon which it does operate, and the statute must contain no provision that would exclude or impede this uniform operation upon all citizens, or all subjects and places, within the state, provided they were brought within the relations and circumstances specified in the act."

It was again construed in Picton v. Cass County, 13 N. D. 242, 100 N. W. 711, 3 Ann. Cas. 345, wherein an act which provided for the enforcement, by judicial proceedings, of taxes upon real property sold to the state or county, and remaining unredeemed for more than three years, and gave to the several boards of county commissioners of all counties in the state a discretionary authority to institute such judicial proceedings, was assailed as violative thereof. In that case this court, speaking through Chief Justice Young, quoted with approval the language used by Mr. Justice Bartholomew in Vermont Loan & T. Co. v. Whithed, quoted above; and further said: "It has already been noted that the act under consideration contains no provision restricting its operation. On the contrary, it is in force and available in every county in the state. It is probable that all counties will not avail themselves of the remedy provided by this act at the same time. Some may proceed in one year, others later, and some possibly not at all. The rights of the county and the state, as well as the tax debtor, in reference to these forfeited lands, in counties where the remedy is invoked, will be different from those which exist in counties where it is not resorted to. This, however, is merely a difference arising from the application of different remedies. The consequences are the same in each county in which the remedy is applied, and, as we have seen, it is applicable to every county in the state. That satisfies the requirement of the Constitution that laws of a general nature shall be of uniform operation. This

provision does not require uniformity in the execution of laws. If it did, practical legislation would be quite impossible. . . . The same contention was urged in Leavenworth County v. Miller, 7 Kan. 479, 12 Am. Rep. 425. In denying it, and holding that an act authorizing counties to subscribe for stock, and to issue bonds to aid in the construction of railroads, did not violate this provision, the court said: 'The act under consideration is so obviously in harmony with this section that the question attempted to be raised upon its supposed incongruity needs no elucidation from us. All the provisions of said act are expressly enacted for the whole state and for every part of the state; and it is no more necessary that the same amount of stock be taken in each and every county in the state, in order that the act shall have a uniform operation therein, than that the same number of men shall be executed in each county of the state, in order that the law punishing murder in the first degree shall have a uniform operation throughout the state.' " See also Minneapolis & N. Elevator Co. v. Traill County, 9 N. D. 213, 50 L.R.A. 266, 82 N. W. 727; State ex rel. Hagen v. Anderson, 22 N. D. 65, 132 N. W. 433.

These decisions are in harmony with the holdings of the Federal Supreme Court on analogous questions. Atkin v. Kansas, 191 U. S. 207, 48 L. ed. 148, 24 Sup. Ct. Rep. 124; Jeffrey Mfg. Co. v. Blagg, 235 U. S. 571, 59 L. ed. 364, 35 Sup. Ct. Rep. 167, 7 N. C. C. A. 570; German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 58 L. ed. 1011, L.R.A.1915C, 1189, 34 Sup. Ct. Rep. 612; Miller v. Wilson, 236 U. S. 373, 59 L. ed. 628, L.R.A. 1915F, 829, 35 Sup. Ct. Rep. 342; Bosley v. McLaughlin, 236 U. S. 385, 59 L. ed. 632, 35 Sup. Ct. Rep. 345; Heim v. McCall, 239 U. S. 175, 60 L. ed. 206, 36 Sup. Ct. Rep. 78; Hadacheck v. Sebastian, 239 U. S. 394, 60 L. ed. 348, 36 Sup. Ct. Rep. 143; Miller v. Strahl, 239 U. S. 426, 60 L. ed. 364, 36 Sup. Ct. Rep. 147.

In Atkin v. Kansas, 191 U. S. 207, 48 L. ed. 148, 24 Sup. Ct. Rep. 124, the court held: "The equal protection of the laws is not denied to a contractor for a public work or his employees by the provisions of Kan. Gen. Stat. 1901, §§ 3827–3829, making it a criminal offense for such contractor to permit or require an employee to perform labor upon the work in excess of eight hours each day." In discussing this point in that case the court said: "Equally without any foundation upon which

to rest is the proposition that the Kansas statute denied to the defendant or to his employee the equal protection of the laws. The rule of conduct prescribed by it applies alike to all who contract to do work on behalf either of the state or of its municipal subdivisions, and alike to all employed to perform labor on such work."

In Jeffrey Mfg. Co. v. Blagg, 235 U. S. 571, 59 L. ed. 364, 35 Sup. Ct. Rep. 167, 7 N. C. C. A. 570, it was held that employers having five or more employees are not denied the equal protection of the laws because their failure to comply with the terms of the Ohio workman's compensation act by paying into a state insurance fund thereby created the premiums required by that act deprives them in negligence suits of the defenses of contributory negligence, assumed risk, and the negligence of fellow servants, while those employing four or less employees are still privileged to make either or all of these defenses.

In German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 58 L. ed. 1011, L.R.A.1915C, 1189, 34 Sup. Ct. Rep. 612, the court held that an act of the Kansas legislature regulating the rates of fire insurance companies was not rendered invalid as to other insurance companies, as denying the equal protection of the laws, by a provision in such act whereby farmers' mutual insurance companies organized and doing business under the laws of the state, and insuring only farm property, were exempted from such regulation.

The state bonding fund act does not discriminate in favor of, or against, any particular municipality or municipalities. Nor does it discriminate against any officer or officers belonging to the same class. It applies equally and uniformly to all municipalities and persons similarly situated. The duties to be performed by the incumbent of a particular office are of the same character in every county in the state. The danger and risk of loss incident to any particular office are presumptively the same in the different counties. If the premiums charged for the official bonds of certain officers are too low, every official of that class, and every county in the state, is similarly affected. If the premium for the official bonds of other officers is too high, every official of that class, and every county in the state, is similarly affected thereby. All are treated alike. The same holds true with respect to other municipalities. This is also true with regard to the limitations placed upon the amount for which any official may be bonded. This limi-

tation applies to all officers and all municipalities. Any municipal officer may be bonded to the amount of $50,000. None can be bonded for a greater amount. So far as the excess is concerned the former law remains.

The limitation in amount of any one risk to be assumed by the state bonding fund is merely a recognition of the same principle found in the laws of this state, limiting the amount of any one risk which an insurance company may assume, and the amount which any banking corporation may loan to any one person or concern. This is generally recognized as a proper and valid exercise of legislative power, as well as sound, wise legislative policy. If it is within the province of legislative power and policy to impose such restrictions upon private corporations engaged in this class of business, there seems to be no good reason why it should be beyond such power to impose restrictions of a similar nature upon the same business when it is carried on under the direction of the state itself.

(14) It is also asserted that the act violates § 186 of the Constitution, which provides that "no money shall be paid out of the state treasury except upon an appropriation by law, and on warrant drawn by the proper officers. . . ." Relator claims "that the moneys collected as premiums and deposited in the state treasury, become a part of the funds in the custody of the state treasurer, and, although in the form of a special fund, they are unquestionably funds in the state treasury, and such funds cannot constitutionally be drawn except in the specific manner pointed out by the Constitution." The same contention was made with respect to the state hail insurance fund. And in the case of State ex rel. Olson v. Jorgenson, 29 N. D. 173, 150 N. W. 565, this court held that the moneys in the state hail insurance fund did not constitute moneys in the state treasury within the provisions of § 186 of the Constitution. In considering this point the court said: "The fund known as the hail insurance fund is composed of moneys which do not belong to the state, and which are not state funds. That fund is not used in carrying on any function of government. It is not raised by taxation, by the payment of fees, is not received from the sale of lands, or for interest on land contracts, or in any other manner which constitutes it a state or public fund, and is not the property of the state. It is derived from premiums paid by

owners of crops within the state, which premiums are held by the state treasurer and disbursed, after paying expenses provided for by the act in question, to pay losses from hail, incurred by the persons whose crops have been insured, and no appropriation is necessary to authorize its disbursement. . . . The treasurer is the custodian of the fund, not a state fund, but a fund belonging to those who contributed it for the purpose named." See also State ex rel. Stevenson v. Stephens, 136 Mo. 537, 37 N. W. 506, and State ex rel. McCue v. Lewis, 18 N. D. 125, 134, 119 N. W. 1037.

The language and reasoning applied to the state hail insurance fund is, also, applicable to the state bonding fund. The moneys in the state bonding fund do not belong to the state, but are deposited with, and held by, the state treasurer in trust, for the benefit and protection of those who under the terms of the act may become claimants against such fund. In no event do such moneys become the funds of the state. They may be disbursed only for three purposes: (1) Operation expenses; (2) payment of losses; (3) accumulation of a surplus fund of $100,000, and at the close of each year, a proportionate distribution among the various municipalities of any moneys in the fund in excess of such surplus fund.

(15) The next contention is that the act constitutes an unwarranted legislative interference with local and municipal affairs. No specific constitutional provision is pointed out as being violated, but the objection rests upon the doctrine, frequently asserted, and at times upheld, known as "the right of local self-government." This doctrine, however, merely recognizes the fundamental principle that "all political power is inherent in the people; " and that the people have the right to distribute the powers of government in such manner as in their judgment the public good may require. Therefore when the people in their Constitution have reserved to themselves the right to have certain local officers perform certain governmental functions, the legislature has no power to deprive the people of the right, thus reserved, either by exercising such governmental functions itself, or by delegating to other officers the right to do so. Ex parte Corliss, 16 N. D. 470, 114 N. W. 962. The right of local self-government is merely a recognition of express or implied constitutional restrictions upon legislative power. The right exists and extends so far, and so far only, as it is reserved by

express or implied constitutional restrictions. It is true that our Constitution recognizes a county government by local officers elected by the people of the county. Const. §§ 166–173; Ex parte Corliss, supra. But it is also true that the legislature is given broad powers with respect to the organization and government of all municipal corporations. Const. §§ 136, 166–173; State ex rel. Johnson v. Clark, 21 N. D. 517, 131 N. W. 715; School Dist. v. King, 20 N. D. 614, 127 N. W. 515; Martin v. Tyler, 4 N. D. 278, 25 L.R.A. 838, 60 N. W. 392; Ex parte Corliss, supra; O'Laughlin v. Carlson, 30 N. D. 213, 152 N. W. 675. In Ex parte Corliss, supra, this court held that the sheriff and state's attorney are constitutional officers, and as such invested with certain inherent functions, and that the legislature could not strip them of these functions and invest a state officer appointed by the governor with the powers expressly or impliedly conferred by the Constitution upon such local officers. But in discussing the legislative power respecting such officers the court said: "We do not deny the power of the legislature to prescribe duties for these officers, which power carries with it by implication the right to change such duties from time to time as the public welfare may demand; but we deny its power to strip such offices, even temporarily, of a portion of their inherent functions and transfer them to officers appointed by central authority." And in discussing the right of local self-government, it said: "We do not mean by this that the people of each county had delegated to them these functions unrestricted by proper legislative regulations; for, as we said before, it is competent for the legislative assembly to provide by law for removals in case of malfeasance or misfeasance in office, and to provide a method of filling such vacancies."

The relations existing between the state and its municipalities were considered by the Supreme Court of the United States in Atkin v. Kansas, 191 U. S. 207, 48 L. ed. 148, 24 Sup. Ct. Rep. 124. The court said: "Such corporations are the creatures, mere political subdivisions, of the state, for the purpose of exercising a part of its powers. They may exert only such powers as are expressly granted to them, or such as may be necessarily implied from those granted. What they lawfully do of a public character is done under the sanction of the state. They are, in every essential sense, only auxiliaries of the state for the purposes of local government. They may be created, or, having been

created, their powers may be restricted or enlarged or altogether withdrawn at the will of the legislature; the authority of the legislature, when restricting or withdrawing such powers, being subject only to the fundamental condition that the collective and individual rights of the people of the municipality shall not thereby be destroyed."

The people, speaking through their lawmaking body, have prescribed rules for the conduct of county, city, and other municipal government, defined the duties and prescribed the qualifications of their officers. It has been provided that certain records must be kept, and that the municipal officers permit their books and accounts to be examined at stated times by the state examiner. It has also been provided that certain municipal officers must furnish official bonds. The relator concedes that the legislature has a right to require municipal officers to furnish bonds, and that the amount, conditions, and kind of bonds to be furnished is a matter for legislative determination. As already stated, under the laws of this state since July 1, 1903, all municipal officers required to furnish bonds have been permitted to furnish surety bonds; and, when furnished, the premium therefor has been paid out of the general fund of the respective municipalities. No contention is made that this former law was invalid. In fact part of relator's argument in this case is based upon the assumption that it is valid, and that the various bonding companies and their stockholders will be deprived of valuable property rights if they are deprived of the premiums which they are now receiving, and expect hereafter to receive, for such official bonds.

The relator, however, contends that the furnishing of such bonds, and the selection of the surety company which shall become surety thereon, is purely a matter for the local authorities, and that it is an unwarranted interference with the right of local self-government to attempt to restrict the municipal authorities in the selection of such surety. We are unable to agree with relator's contention. The Constitution does not directly or by necessary implication invest the municipal authorities with the right to prescribe the qualifications of their officers. As already stated it was for the legislature to determine what municipal officers should furnish bonds, and it was also for the legislature to determine the qualifications of the surety thereto. Surety companies became competent sureties upon official bonds only when the

legislature said so. The bonding of municipal officers is not altogether a local matter. Official bonds are for the protection, not only of the respective municipalities and their people, but for the protection of all people who may be damaged by the malfeasance, nonfeasance, or defalcation of such officers.

The power of the legislature to control its municipalities in matters of public concern is generally recognized. 28 Cyc. 301, 308, 311. It has been recognized by this court, and by the highest court in the land. In Tribune Printing & Binding Co. v. Barnes, 7 N. D. 591, 75 N. W. 904, this court sustained the validity of, and enforced, an act requiring that "all county printing [including all legal notices published by or in behalf of the county and all supplies and printed matter necessarily used by county officials in discharging their duties] shall be done in the state, and if practicable in the county ordering the same." And in State ex rel. McCue v. Lewis, 18 N. D. 125, 119 N. W. 1037, this court sustained the constitutionality of an act requiring each county in the state to pay $50 semi-annually to the superintendent of the Institute for the Feeble-minded, for each indigent inmate of such institution, admitted from such county. In Heim v. McCall, 239 U. S. 175, 60 L. ed. 206, 36 Sup. Ct. Rep. 78, the Supreme Court of the United States affirmed the New York court of appeals, and sustained the constitutionality of a statute which provided that only citizens of the United States might be employed in the construction of public works by or for the state or any of its municipalities, and that in such employment citizens of New York must be given preference. In paragraph 2 of the syllabus in that case the Federal Supreme Court held: "The general power of a state over its municipalities extends to the regulation of the kind of laborers which may be employed in the construction of public works by or for such municipalities."

The relator has cited and relies largely upon decisions of the supreme court of Michigan. The Michigan Constitution guarantees the right of local self-government (at least so far as cities and villages are concerned), in far more comprehensive and extensive terms than does the Constitution of this state; and no court has more consistently and vigorously upheld this right than has the supreme court of Michigan. The question was last considered by that court in the case of Wood v. Detroit — Mich. —, L.R.A.1916C, 388, 155 N. W. 592. It was there

contended that the constitutional guaranties of the right of local self-government was violated by the workman's compensation act, which subjected municipal corporations to the provisions of the act. In discussing this question the Michigan supreme court said: "The actual basis for the carrying on by municipal corporations of private municipal business is taxation. There is not, and there cannot be, any merely local power to tax persons or property, and municipal activity may still be, and it is the command of the Constitution that it shall be, restricted, limited, by the limitation of the power to tax, to borrow money and to exploit the municipal credit. Moreover, municipal corporations are still state agencies, and as such subject to legislative direction and control, none the less so because the exercise of such control may indirectly affect a private municipal activity. The act, in its application to municipalities, involves no right of local self-government, or local control and management of corporate property. It deprives the municipality of none of its property, because, in effect, it is made lawful to raise by tax the money required to pay all injured employees some compensation. A new public purpose for which taxes may be levied is declared." See also San Luis Obispo County v. Murphy, 162 Cal. 588, 123 Pac. 808, Ann. Cas. 1913D, 712; People v. Crane, 214 N. Y. 154, L.R.A.1916D, 550, 108 N. E. 427, Ann. Cas. 1915B, 1254; Chicago v. Sturges, 222 U. S. 313, 56 L. ed. 215, 32 Sup. Ct. Rep. 92, Ann. Cas. 1913B, 1349; Arnett v. State, 168 Ind. 180, 8 L.R.A.(N.S.) 1192, 80 N. E. 153; Borgnis v. Falk Co. 147 Wis. 327, 37 L.R.A.(N.S.) 489, 133 N. W. 209, 3 N. C. C. A. 649; 28 Cyc. 301 et seq. We reach the conclusion that no express or implied constitutional guaranties of the right of local self-government is violated by the provisions of the state bonding fund act.

(16–17) It is next contended that the act violates the following constitutional provisions relative to taxation and the expenditure of moneys raised by taxation.

Section 175. "No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied."

Section 176. Taxes shall be uniform upon the same class of property, and shall be levied and collected for public purposes only.

Section 179. "All property . . . shall be assessed in the county,

city, township, village or district in which it is situated, in the manner prescribed by law. . . ."

We will consider the alleged violations in their respective order.

It is contended that as the act, which (if valid) went into effect January 1, 1916, provides for the payment of premiums in advance, that this will in many instances necessitate such payment before any taxes can be levied or collected for that purpose, and that therefore moneys raised for other purposes must be diverted in order to pay such premiums. A sufficient answer to this contention is that under the laws of this state the various municipalities which may be required to pay such premiums to the state bonding fund have been required to pay such premiums on official bonds of their municipal officers when written by surety companies since 1903. (Comp. Laws 1913, §§ 664, 667, and 669.) It was therefore the duty of the municipal authorities to make proper provision for funds for this purpose, and it is presumed that such provision has been made. It is not contended that the premiums to be paid to the state bonding fund are in excess of those formerly, or now required, to be paid for such bonds to the various surety companies. On the contrary, relator's argument in support of the attack made on another provision of the law is based on the theory that the premiums charged by the state bonding fund are less than those charged by surety companies. So far as the various municipalities are concerned, they are merely required to pay the premium to the state bonding fund instead of to some surety company. The moneys are paid for the same purpose for which they were raised, viz., to compensate a surety qualified by the laws of this state for the risk assumed in becoming surety on such official bond. See also 11 Cyc. 582; 28 Cyc. 310.

The relator, also, asserts that the various municipalities are required to contribute to the payment of losses occurring in other municipalities, and that moneys raised by taxation from citizens of one taxing district may be distributed for the benefit and to the uses of citizens of another taxing district. Relator says: "Every tax raised must not only be for a public purpose, but it must be for a local public purpose and expended in the district in which it was raised. Taxes are reciprocal in their nature; citizens paying taxes are entitled to a return in the expenditure of such moneys in the subdivision in which the same is paid in."

It is true the Constitution requires that all taxable property shall be assessed in the taxing district in which it is situated (Const. § 179), and that taxes can be levied and collected only for public purposes (Const. § 176.) And citizens of this state are doubtless entitled to have their property assessed in the place designated, and only for the purposes permitted, by the Constitution. But we are aware of no constitutional requirement that taxes levied for a general public purpose must be expended and disbursed in the taxing district in which they were collected. If this were true, every department, not only of the state, but also of county, government, would soon cease to operate. The moneys paid by any municipality to the state bonding fund are expended primarily for the benefit of such municipality. The premium paid is in consideration of the obligation assumed by the state bonding fund to indemnify such municipality (and all others) against loss by reason of the breach of official duty on part of the officers bonded. For the past twelve years and over the various municipalities have been required to pay such premiums to the various surety companies who performed this service. Does the performance of this service by an agency created and operated by the state change the functions and objects of such service? Does payment of money to a state agency for a service formerly rendered by private corporations cease to be moneys expended for a public purpose? Clearly not. The service rendered to the municipality is of substantially the same character whether it is performed by a private corporation or by a state fund operated for the mutual protection of all participants. In either event the moneys paid for such premiums may be, in whole or in part, expended and distributed outside of the taxing district where raised. The municipality, however, has received what it paid for when it receives the official bond executed by the surety. It is for the protection afforded and the risk assumed thereby that the premium is paid. If anything, the performance of this service by a public agency adds to, rather than detracts from, the public character of the services thus performed. As said by the supreme court of Michigan, in Wood v. Detroit, — Mich. —, L.R.A.1916C, 388, 155 N. W. 592, 596: "The distinction between powers governmental in character and those private in character, as exercised by municipal corporations, does not involve the abrogation of the distinction between private municipal activity and private indi-

vidual activity. To employ a seeming paradox, private municipal activities are all of them public. What has been called private in municipal activity is, nevertheless, public when contrasted with purely private enterprise and adventure."

In State ex rel. Goodwin v. Nelson County, 1 N. D. 88, 8 L.R.A. 283, 26 Am. St. Rep. 609, 45 N. W. 33, this court held that an act authorizing counties to issue bonds to procure seed grain for needy farmers resident therein was a valid exercise of legislative power, and that the tax provided for in the statute was laid for a public purpose.

In the case of Cunningham v. Northwestern Improv. Co. 44 Mont. 180, 119 Pac. 554, 1 N. C. C. A. 720, the supreme court of Montana held that a tax levied to raise a fund to provide industrial insurance benefits to injured employees engaged in extra hazardous occupations is for a "public purpose," notwithstanding the fact that the act operated to the direct benefit of the injured employee or his dependents, and not directly to the public generally.

In Brodhead v. Milwaukee, 19 Wis. 658, 88 Am. Dec. 711, the supreme court of Wisconsin considered the validity of a tax imposed for the payment of bounties to volunteers who might enlist in the service of the United States during the Civil War. The court reached the conclusion that the tax was levied for a public purpose. In discussing this point it said: "The objects for which money is raised by taxation must be public and such as subserve the common interest and well-being of the community required to contribute. To justify the court in arresting the proceedings and declaring the tax void, the absence of all possible public interest in the purposes for which the funds are raised must be clear and palpable—so clear and palpable as to be perceptible by every mind at the first blush."

In Borgnis v. Falk Co. 147 Wis. 327, 37 L.R.A.(N.S.) 489, 133 N. W. 209, 3 N. C. C. A. 649, it was held that the provisions of the Wisconsin workmen's compensation act requiring municipal corporations to compensate all workmen injured in their employ did not require taxes to be levied for other than public purposes, or deprive tax payers of their property without due process of law.

In the case of Noble State Bank v. Haskell, 22 Okla. 48, 97 Pac. 590, 219 U. S. 104, 55 L. ed. 112, 32 L.R.A.(N.S.) 1062, 31 Sup. Ct. Rep. 186, Ann. Cas. 1912A, 487, the supreme court of Oklahoma and the

Supreme Court of the United States sustained the constitutionality of the Oklahoma depositors' guaranty law, which authorized the assessment and collection of a certain per cent on the daily average deposit of each and every bank organized under the laws of the state, as a fund to pay the losses caused depositors by failing and insolvent banks. The Supreme Court of the United States, in answer to the objection that the act took property for a private use and created a liability without fault, said: "The substance of the plaintiff's argument is that the assessment takes private property for private use without compensation. And while we should assume that the plaintiff would retain a reversionary interest in its contribution to the fund, so as to be entitled to a return of what remained of it if the purpose were given up (see Danby Bank v. State Treasurer, 39 Vt. 92, 98), still there is no denying that by this law a portion of its property might be taken without return to pay debts of a failing rival in business. Nevertheless, notwithstanding the logical form of the objection, there are more powerful considerations on the other side. In the first place, it is established by a series of cases that an ulterior public advantage may justify a comparatively insignificant taking of private property for what, in its immediate purpose, is a private use. (Citation of authorities.) And in the next, it would seem that there may be other cases beside the everyday one of taxation, in which the share of each party in the benefit of a scheme of mutual protection is sufficient compensation for the correlative burden that it is compelled to assume. See Ohio Oil Co. v. Indiana, 177 U. S. 190, 44 L. ed. 729, 20 Sup. Ct. Rep. 576, 20 Mor. Min. Rep. 576. At least, if we have a case within the reasonable exercise of the police power as above explained, no more need be said." See also Hunter v. Colfax Consol. Coal Co. — Iowa, —, L.R.A.—, —, 154 N. W. 1037, 1058; State ex rel. Davis-Smith Co. v. Clausen, 65 Wash. 156, 37 L.R.A.(N.S.) 466, 117 Pac. 1101, 2 N. C. C. A. 823, 3 N. C. C. A. 599; State ex rel. Yaple v. Creamer, 85 Ohio St. 349, 39 L.R.A.(N.S.) 694, 97 N. E. 602, 1 N. C. C. A. 30; Cunningham v. Northwestern Improv. Co. 44 Mont. 180, 119 Pac. 554, 1 N. C. C. A. 720; Mathison v. Minneapolis Street R. Co. 126 Minn. 286, L.R.A.1916D, 412, 148 N. W. 71, 5 N. C. C. A. 871; and Wood v. Detroit, — Mich. —, L.R.A.1916C, 388, 155 N. W. 592, 4 Words & Phrases, 2d series, 30, 31.

It is next contended that the provisions of the act relating to the creation of a fund of $100,000 and a distribution of the excess render it repugnant to the constitutional provisions above quoted, relating to taxation. Relator says: "The accumulation of such fund is not for a public purpose, and the distribution therein provided for is the exaction of a tribute from the present citizen of the state to such citizen of the state as shall be residents of particular taxing districts at the time the same is distributed, for when distributed it will be used for the purpose of that particular district and to the benefit of the people then resident therein."

We think this argument is fully answered by the authorities cited and quoted in the preceding paragraph. The sole function of the state bonding fund is to write official bonds. "The legislature was confronted with the duty to devise a plan, complete in itself, for dealing with the subject and accomplishing the desired purpose. The limitation upon its power in this direction is the Constitution, which I think it has not contravened." (Wood v. Detroit, — Mich. —, L.R.A. 1916C, 388, 155 N. W. 592, 596.)

Obviously the operation of this fund may result in either a surplus or a deficit. This act provides for both contingencies. It is desirable that funds be available for the payment of claims as they may accrue. The moneys paid for premiums are primarily intended for the protection of claimants and the payment of claims. The distribution of any possible or probable surplus is a mere incidental matter, and certainly the legislature has power to prescribe reasonable conditions for the operation of the fund so as to render the same best able to accomplish the purpose for which it was created.

The next and last objection urged is that the act violates the fundamental law in that it engages the sovereign state in a private business in competition with the citizens of the state. The relator has not specified any particular constitutional provision violated, but contends that the service endeavored to be performed by the state bonding fund is not a function of the government, but distinctly a private business.

(18) Very early in the history of the state this court held that the legislature, in exercise of the police power, might prohibit private banking, which previously had been permitted in the territory and state, and require all banks to be organized and conducted under certain

rules and regulations prescribed by the legislature. "The legislative prerogative," said Mr. Justice Wallin, speaking for the court, in State ex rel. Goodsill v. Woodmansee, 1 N. D. 246, 250, 11 L.R.A. 420, 46 N. W. 970, "in the exercise of its police power in promoting the public safety, not only to regulate and restrict the business of banking, but also to grant the right to one class, and to prohibit to others, or even to forbid it altogether, has never been questioned in the courts, and the legislatures of other states have frequently exercised the right of supreme control over the business." This principle was approved by the Supreme Court of the United States in Noble State Bank v. Haskell, supra. In defining the police power and pointing out the wide extent of its operations, Mr. Justice Holmes, speaking for the court in Noble State Bank v. Haskell, supra, said: "It may be said in a general way that the police power extends to all the great public needs. Campfield v. United States, 167 U. S. 518, 42 L. ed. 260, 17 Sup. Ct. Rep. 864. It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare."

In discussing the same subject in German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 58 L. ed. 1011, L.R.A.1915C, 1189, 34 Sup. Ct. Rep. 612, the court said: "What makes for the general welfare is necessarily, in the first instance, a matter of legislative judgment, and a judicial review of such judgment is limited. 'The scope of judicial inquiry in deciding the question of *power* is not to be confused with the scope of legislative considerations in dealing with the matter of *policy*. Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance.' Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 569, 55 L. ed. 328, 339, 31 Sup. Ct. Rep. 259." See also State v. Olson, 26 N. D. 304, L.R.A.—, —, 144 N. W. 661.

The power of the legislature to regulate the business of insurance is universally recognized. That such regulation may exist to the extent of prescribing the form of contract, limiting the amount of risk

to be assumed, and generally imposing such reasonable conditions as the legislature deems public safety and welfare to require, has never been questioned in this state. That the business of insurance is so far impressed with public interest as to justify legislative regulation of its rates has been decided not only by various state supreme courts, but by the Supreme Court of the United States. State ex rel. Martin v. Howard, 96 Neb. 278, 147 N. W. 689; People v. Hartford L. Ins. Co. 252 Ill. 398, 37 L.R.A.(N.S.) 778, 96 N. E. 1049; German Alliance Ins. Co. v. Barnes, 189 Fed. 769; German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 58 L. ed. 1011, L.R.A.1915C, 1189, 34 Sup. Ct. Rep. 612.

In discussing the business of insurance, and the extent to which it has become affected with a public interest, the Supreme Court of the United States, in German Alliance Ins. Co. v. Lewis, supra, said: "Indeed, it is a matter of common knowledge that rates are fixed and accommodated to those standards and classification in prearranged schedules, and, granted the rates may be varied in particular instances, they are sufficiently definite and applicable as a general and practically constant rule. They are the product, it is true, of skill and experience, but such skill and experience a regulating body may have as well as the creating body. . . . It would indeed be a strained contention that the government could not avail itself, in the exercise of power it might deem wise to exert, of the skill and knowledge possessed by the world."

The court further said: "The restrictions upon the legislative power which complainant urges we have discussed, or rather the considerations which take, it is contended, the business of insurance outside of the sphere of the power. To the contention that the business is private we have opposed the conception of the public interest. . . . How can it be said that the right to engage in the business is a natural one when it can be denied to individuals and permitted to corporations? How can it be said to have the privilege of a private business when its dividends are restricted, its investments controlled, the form and extent of its contracts prescribed, discriminations in its rates denied, and a limitation on its risks imposed? Are not such regulations restraints upon the exercise of the personal right—asserted to be fundamental—

of dealing with property freely, or engaging in what contracts one may choose, and with whom and upon what terms one may choose?

We may venture to observe that the price of insurance is not fixed over the counters of the companies by what Adam Smith calls the higgling of the market, but formed in the councils of the underwriters, promulgated in schedules of practically controlling constancy which the applicant for insurance is powerless to oppose, and which, therefore, has led to the assertion that the business of insurance is of monopolistic character, and that 'it is illusory to speak of a liberty of contract.' "

The state's authority to create funds for the benefit of certain classes, and impose upon those properly chargeable therewith the burden of making payments to such funds, has frequently been recognized. Statutes imposing a liability upon fire insurance agents, based upon the amount of the insurance effected by them, for the benefit of a fund to care for and cure sick and injured firemen, have been upheld in the states of New York and Illinois. Fire Dept. v. Noble, 3 E. D. Smith, 440; Fire Dept. v. Wright, 3 E. D. Smith, 453; Exempt Firemen's Benev. Fund v. Roome, 29 Hun, 391, 394; Firemen's Benev. Asso. v. Lounsbury, 21 Ill. 511, 74 Am. Dec. 115. And an act establishing and maintaining a pension fund for city employees was upheld in Illinois. Hughes v. Traeger, 264 Ill. 612, 106 N. E. 431. So, also, do the various workmen's compensation acts provide for an insurance fund. And, as already stated, the Oklahoma depositors' guaranty law provided for a fund for the protection of depositors.

No person is required to become a depositor in any particular bank, but all persons are required to transact official business with the particular officers designated for that purpose. Obviously if a state may operate a fund for the benefit and protection of depositors in banks, it may, with far more reason and propriety, operate a fund for the protection of those who may be injured by reason of the wrongful act, neglect of duty, or defalcation of some public officer.

It is not necessary for us to determine whether the state can engage in a private trade or business. That question is not presented in this case. The state bonding fund is not intended to transact private business. It may not bond any private individual or secure the performance of any private duty. Its bonds may be issued only to public officers to secure the public, the state, and its municipalities against loss by

reason of the nonfeasance, misfeasance, or defalcation of such officers. Whether any necessity exists for requiring such protection, the extent thereof, and the proper method of affording the same, are concededly proper matters for legislative determination. Because, as we have already indicated, the legislature has sole and exclusive control over the matter of official bonds to be given by municipal officers. It can fix the amount and prescribe the conditions of such bonds, as well as determine by what surety the same shall be executed and the qualifications of such surety; or the legislature may entirely dispense with the requirement that such bonds be furnished. The right of surety companies to become surety on such bonds rests solely upon the legislative authority permitting them to do so. The legislature in the first instance decided that certain public officers must furnish bonds. At that time it prescribed the qualifications of the personal sureties and the number required. Subsequently the legislature determined that public welfare and safety demanded that county treasurers be required to furnish surety bonds. Later it determined that all county and municipal officers, required to furnish bonds, might furnish surety bonds at the expense of the respective municipalities. By the enactment of the state bonding fund act, the legislature has said that public welfare and safety requires the creation and operation of such fund for the purpose of furnishing this method of indemnity against loss which may occur by the nonfeasance, misfeasance, or defalcation of public officials. The state credit is not affected in any manner. The moneys in the fund do not constitute state funds, nor will any indebtedness against the fund constitute an indebtedness of the state. It is merely a fund which the state has authorized to be established and operated for the mutual benefit and protection of the various municipalities and the people of the state in general. The entire subject-matter of the legislation relates to matters peculiarly within legislative control, and impressed in an unusual degree with public interest. In enacting the state bonding fund act, the legislature exercised its police power,— "the power inherent in every sovereignty . . . the power to govern men and things,"—under which power, the legislature may, within constitutional limitations, not only prohibit all things hurtful to the comfort, safety, and welfare of society, but prescribe regulations to promote the public health, morals, and safety, and add

to the general public convenience, prosperity, and welfare. See 6 R. C. L. §§ 182 et seq.; 3 Words & Phrases, 2d Series, 1064 et seq., and authorities there cited.

The relator, also, assails the wisdom and policy of the legislation. As we have already stated this was a matter for legislative consideration. And, to quote the language of the highest court in the land, "if it be said that a statute like the one before us is mischievous in its tendencies, the answer is that the responsibility therefor rests upon legislators, not upon courts. No evils arising from such legislation could be more far reaching than those that might come to our system of government if the judiciary, abandoning the sphere assigned to it by the fundamental law, should enter the domain of legislation, and, upon grounds merely of justice or reason or wisdom, annul statutes that had received the sanction of the people's representatives. We are reminded by counsel that it is the solemn duty of the courts in cases before them to guard the constitutional rights of the citizen against merely arbitrary power. That is unquestionably true. But it is equally true—indeed, the public interests imperatively demand—that legislative enactments should be recognized and enforced by the courts as embodying the will of the people, unless they are plainly and palpably, beyond all question, in violation of the fundamental law of the Constitution." Atkin v. Kansas, 191 U. S. 207, 48 L. ed. 148, 24 Sup. Ct. Rep. 124.

Our conclusion is that the act in question is not vulnerable to any of the attacks made against it in this proceeding. The writ prayed for is denied.

All concur.